UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – – – – – – –x

|  |  |  |
|---|---|---|
| SONYA WHITTEN LATIMORE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | 07 CIV 9338 (AKH) (JCF) |
| | : | |
| NBC UNIVERSAL, INC. d/b/a NBC UNIVERSAL | : | |
| TELEVISION DISTRIBUTION, REVEILLE, LLC, | : | |
| McCREARY & FULLER PUBLIC RELATIONS CORP., | : | |
| KIM FULLER, Individually and as partner of McCREARY | : | |
| & FULLER PUBLIC RELATIONS CORP., and DOES 1 | : | |
| through 50, inclusive, | : | |
| | : | |
| Defendants. | : | |
| | : | |

– – – – – – – – – – – – – – – – – – – – – – – – – – – – –x

### MEMORANDUM OF LAW OF NBC UNIVERSAL, INC., AND REVEILLE, LLC, IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56

Katten Muchin Rosenman LLP
575 Madison Avenue
New York, New York 10022
Telephone: (212) 940-8800
Facsimile:  (212) 940-8776

*Attorneys for Defendants NBC Universal, Inc., and Reveille, LLC*

**TABLE OF CONTENTS**

**Page(s)**

PRELIMINARY STATEMENT ................................................................................. 2

FACTUAL BACKGROUND ................................................................................. 5

    **A.**    Prior Art:  Weight Loss Competitions and Reality Television  Shows
            Preceding Plaintiff's Treatment ................................................................... 5

    **B.**    Plaintiff's Treatment ................................................................................. 8

    **C.**    *The Biggest Loser* Television Series ........................................................ 10

            **1.**        The Creation of *The Biggest Loser* ..................................................... 10

            **2.**        Summary Description of *The Biggest Loser* Series ............................ 12

    **D.**    The Creators of *Biggest* Did Not Have Access to Plaintiff's Treatment ............. 14

ARGUMENT ................................................................................................ 16

    **A.**    Applicable Procedural Law .................................................................... 17

    **B.**    Plaintiff Has Not Raised A Genuine Issue of "Access" To Her
            Treatment By Anyone Involved in the Creation of *The Biggest Loser* ............... 18

    **C.**    Plaintiff Cannot Show that *The Biggest Loser* Television Series is
            "Substantially Similar" to Her Treatment ........................................................ 21

            **1.**        Summary Judgment Is Required Where Two Works Are Not
                      "Substantially Similar" Under The Second Circuit's "More
                      Discerning Ordinary Observer" Test ..................................................... 22

            **2.**        Plaintiff Has Failed to Identify *Any* Protectible Similarities
                      Between Her Treatment and *The Biggest Loser* ................................... 24

    **D.**    The NBC Defendants Have Produced Uncontroverted Evidence That
            *The Biggest Loser* Was Independently Created, Without Reference to
            Plaintiff's Treatment .............................................................................. 29

    CONCLUSION ........................................................................................... 30

## TABLE OF AUTHORITIES

**Cases**

Abend Revocable Trust v. Spielberg,
    No. 08-cv-7810, 2010 WL 3701343 (S.D.N.Y. Sept. 21, 2010) .......................... 17, 22, 23

Am. Direct Mktg., Inc. v. Azad Int'l, Inc.,
    783 F. Supp. 84 (E.D.N.Y. 1992) ................................................................................. 27

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986) ..................................................................................................... 17

Bethea v. Burnett,
    No. 04-cv-7690, 2005 WL 1720631 (C.D. Cal. June 28, 2005) ............................ 5, 23, 24

Boisson v. Banian, Ltd.,
    273 F.3d 262 (2d Cir. 2001) ........................................................................................ 22

Bunick v. UPN,
    No. 06-cv-2833, 2008 WL 1968305 (S.D.N.Y. Apr. 30, 2008) ................................. 19, 29

CBS Broad., Inc. v. ABC, Inc.,
    No. 02-CV-08813-LAP, 2003 WL 23407514 (S.D.N.Y. Jan. 14, 2003) ........................ 27

D'Amico v. City of New York,
    132 F.3d 145 (2d Cir. 1998) ........................................................................................ 17

Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,
    499 U.S. 340 (1991) ..................................................................................................... 17

Gaste v. Kaiserman,
    863 F.2d 1061 (2d Cir. 1988) ...................................................................................... 18

Jorgensen v. Epic/Sony Records,
    351 F.3d 46 (2d Cir. 2003) .................................................................................. 2, 17, 18

Litchfield v. Spielberg,
    736 F.2d 1352 (9th Cir. 1984) ..................................................................................... 24

Milano v. NBC Universal, Inc.,
    584 F. Supp. 2d 1288 (C.D. Cal. 2008) ................................................................. passim

Mowry v. Viacom Int'l, Inc.,
    No. 03-civ-3090, 2005 WL 1793733 (S.D.N.Y. July 29, 2005) ........................... 18, 19, 21

Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.,
    602 F.3d 57 (2d Cir. 2010)........................................................................ 4

Reyher v. Children's Television Workshop,
    533 F.2d 87 (2d Cir. 1976)................................................................. 21, 22

Rodriguez v. Heidi Klum Co., LLC,
    No. 05-cv-10218, 2008 WL 4449416 (S.D.N.Y. Sept. 30, 2008) ........................... passim

Tienshan, Inc. v. C.C.A. Int'l,
    895 F. Supp. 651 (S.D.N.Y. 1995)............................................................. 18

Tisi v. Patrick,
    97 F. Supp. 2d 539 (S.D.N.Y. 2000)............................................... 5, 18, 19, 29

Walker v. Time Life Films, Inc.,
    784 F.2d 44 (2d Cir. 1986)............................................................... passim

Williams v. Crichton,
    84 F.3d 581 (2d Cir. 1996)............................................................... 21, 22

Willis v. Home Box Office,
    No. 00-cv-2500, 2001 WL 1352916 (S.D.N.Y. Nov. 2, 2001)................................. 23, 29

Zella v. E.W. Scripps Co.,
    529 F. Supp. 2d 1124 (C.D. Cal. 2007) ............................................... 5, 23, 24

**Statutes**

17 U.S.C. § 102........................................................................................ 22

**Rules**

Fed. R. Civ. Proc. Rule 56 ......................................................................... 2, 17

Defendants NBC Universal, Inc., ("NBC") and Reveille, LLC ("Reveille") (collectively, "NBC Defendants"), respectfully submit this memorandum of law in support of their motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing the claim asserted against them in the Amended Complaint filed by plaintiff Sonya Whitten Latimore ("Plaintiff").

## PRELIMINARY STATEMENT

In a flawed attempt to enjoin the NBC Defendants from continuing to broadcast *The Biggest Loser ("Biggest")* and to recover unspecified damages, Plaintiff asserts that *Biggest*—a successful reality television weight loss competition program—impermissibly infringes upon her copyright in an unpublished four page treatment entitled "Phat Farm/Fat Farm - A Weight Loss Adventure" ("Phat Farm" or "Treatment"). Plaintiff's copyright claim is devoid of evidentiary support and cannot overcome copyright law precedent that establishes Plaintiff's claim is without merit for multiple, independent reasons.

To prevail on her copyright claim, Plaintiff must show both that the NBC Defendants (i) had "access" to her Treatment, and (ii) that they unlawfully appropriated protectible elements of the Treatment such that *Biggest* and the Treatment are "substantially similar." As set forth below, Plaintiff cannot establish the existence of a genuine issue of material fact to support the existence of either of these fundamental elements of a copyright claim.

Without "significant, affirmative and probative evidence" of access, Plaintiff's claim fails on summary judgment. Jorgensen v. Epic/Sony Records, 351 F.3d 46, 51 (2d Cir. 2003) (granting summary judgment dismissal of copyright claim; "access cannot be based on mere 'speculation or conjecture'"). In Argument section B below, the NBC Defendants show that there is no genuine issue of material fact on the access element of Plaintiff's claim. In brief,

Plaintiff admitted during her deposition that she has no personal knowledge that the NBC Defendants were aware of her Treatment prior to the first broadcast of *Biggest*. (Friedman Aff. ¶ 2, Latimore Tr. 55:7-11; R. 56.1 Stmt. ¶ 73).[1]  Moreover, the only conjecture Plaintiff proffered as to how the NBC Defendants may have had access to her treatment is unsupported by any admissible evidence.  Plaintiff admitted that the only defendant she gave her Treatment to was defendant Kim Fuller ("Fuller"), and she has no personal knowledge of Fuller giving the Treatment to the NBC Defendants.  (Latimore Tr. 96:6-97:17; R. 56.1 Stmt. ¶ 58, 75).   In contrast, Fuller provided a sworn Declaration in which he stated unequivocally that he did not communicate with the NBC Defendants or provide Plaintiff's Treatment to them, (Fuller Decl. ¶ 10; R. 56.1 Stmt. 64), and he reaffirmed these statements during his deposition.  (Friedman Aff. ¶ 4, Fuller Tr. 46:15-21, 46:25-48:9; R. 56.1 Stmt. ¶ 64).[2]

Plaintiff also asserts, without any evidentiary basis, that Miatta Haj Smith, the person who introduced Plaintiff to Fuller, spoke with the NBC Defendants about Plaintiff's Treatment.  However, Ms. Smith has provided a Declaration that flatly denies Plaintiff's unsupported claim.  (Declaration of Miatta Haj Smith ["Smith Decl."] ¶ 5; R. 56.1 Stmt. ¶ 83).   Plaintiff has proffered no other theory of access.

As shown in Argument section C below, Plaintiff's copyright claim is separately flawed because the alleged similarities between the Treatment and *Biggest* are not protected by the Copyright Act.  Plaintiff's Treatment consists of a general idea for a weight loss competition show.   Neither that idea, nor the stock elements and *scenes a faire* flowing from it are

---

[1]   "Latimore Tr." refers to the transcript of the deposition of Plaintiff taken in this action. Copies of pages from the Latimore Tr. cited herein are attached as Exhibit A to the Friedman Affidavit.

[2]   "Fuller Tr." refers to the transcript of the deposition of Fuller taken in this action. Copies of pages from the Fuller Tr. cited herein are attached as Exhibit C to the Friedman Affidavit.

protectible.  See <u>Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.</u>, 602 F.3d 57, 68 (2d Cir. 2010) (affirming Rule 12(b)(6) dismissal of copyright claim; "rough ideas of general nature" are not protectible).  Plaintiff's Treatment and *Biggest* both involve reality television programs in which overweight individuals compete to lose the most weight for a prize; and the contestants diet, exercise with a fitness trainer, weigh in and face food temptations, compete for rewards, and experience emotional moments of success and failure.  However, these stock elements are present in virtually <u>all</u> weight loss competition television programs, including many that pre-date both "Phat Farm" and *Biggest*.[3]

The law is clear that similarity of such stock elements and *scenes a faire* for a weight loss competition show do not support a copyright claim.  See, e.g., <u>Milano v. NBC Universal, Inc.</u>, 584 F. Supp. 2d 1288, 1296-1297 (C.D. Cal. 2008) (granting summary judgment and dismissing different litigant's copyright claim against *Biggest*; "Plaintiff simply cannot succeed in this case by claiming a copyright in the idea of a television show based on a weight loss competition"); <u>Walker v. Time Life Films, Inc.</u>, 784 F.2d 44, 50 (2d Cir. 1986) (affirming summary judgment dismissal of copyright claim; ruling that similarities between the two works consisted of unprotected "scenes a faire" and "stock" themes).

Finally, Plaintiff's copyright action is separately flawed because the NBC Defendants created *Biggest* without any reference to "Phat Farm."  In their declarations, and the deposition testimony attached thereto, the heads of Reveille and 25/7 Productions (Ben Silverman and David Broome, respectively), set forth how they conceived and developed the various elements that comprise *Biggest* entirely independent of Plaintiff.  (R. 56.1 Stmt. ¶¶ 4-29).  Plaintiff has no

---

[3]     Indeed, Plaintiff herself admits that she was aware of at least two weight loss television shows and other reality television shows at the time she wrote the Treatment.  (Latimore Tr. 104:2-10; R. 56.1 Stmt. ¶ 45).

contrary evidence. Thus, summary judgment is also required on this basis. Tisi v. Patrick, 97 F.

Supp. 2d 539, 549 (S.D.N.Y. 2000) (granting summary judgment; [e]ven a *prima facie* case of

copying may be rebutted by proof of independent creation").

     In summary, for multiple independent reasons, Plaintiff's copyright claim should be

dismissed because (1) she has proffered no evidence of access, (2) substantial similarity does not

exist, and (3) NBC Defendants have proffered uncontroverted evidence of independent creation.

Indeed, granting summary judgment here would be consistent with the decisions of other courts

that have dismissed infringement claims asserted against reality television shows prior to trial.

See, e.g., Milano, supra, 584 F. Supp. 2d 1288 (summary judgment dismissal); Rodriguez v.

Heidi Klum Co., LLC, No. 05-cv-10218, 2008 WL 4449416 (S.D.N.Y. Sept. 30, 2008)

(summary judgment dismissal); Bethea v. Burnett, No. 04-cv-7690, 2005 WL 1720631 (C.D.

Cal. June 28, 2005) (summary judgment dismissal); Zella v. E.W. Scripps Co., 529 F. Supp. 2d

1124 (C.D. Cal. 2007) (Rule 12(b)(6) dismissal).

## FACTUAL BACKGROUND

**A.**    **Prior Art:  Weight Loss Competitions and Reality Television**
        **Shows Preceding Plaintiff's Treatment**

     The idea of a reality television weight loss competition is not protectible and, in any

event, did not originate with Plaintiff (Latimore Tr. 124:9-18; R. 56.1 Stmt. ¶ 44).  In his expert

report (the "Expert Report"), David Ginsburg[4] describes six weight loss competition shows that

aired before Plaintiff wrote her Treatment (two of which aired on NBC). (Ginsburg Decl. ¶ 2,

Ex. Z ["Expert Report"], pp. 9-12).  These programs contain many of the same stock elements

---

[4]    The NBC Defendants' expert, David Ginsburg, is the Executive Director of the
University of California Los Angeles School of Law's Entertainment and Media Law and Policy
Program and an experienced television producer, as detailed in his Declaration.

that naturally flow from the general idea of a weight-loss competition that appear in Plaintiff's later-written Treatment:

(1) **"The Big Diet"**: This show involved a weight loss competition in which contestants lived together under constant cameras for thirteen weeks of diet, exercise, temptations, rewards, photographs, celebrity guests and on-screen weekly weigh-ins. "The Big Diet" had weekly eliminations, and the winner was awarded a prize. (Expert Report, pp. 9-10; Saltsman Decl. ¶ 13, Ex. P; R. 56.1 Stmt. ¶ 84).

(2) **"The Discovery Health Body Challenge"**: This show involved a diet and fitness competition in which contestants' weight, body measurements and fat percentages were tracked. The show included the customary rituals of, among other things, weigh-ins, nutritional tips and a prize to the winner. (Expert Report, p. 10; Saltsman Decl. ¶ 6, Ex. I; R. 56.1 Stmt. ¶ 88).

(3) **"Get Fit Today"**: This was an eight-week weight loss competition feature story broadcast on NBC's Today Show. The contestants on the show were grouped into teams and guided by a dietician, exercise coach and fitness experts. The team that lost the most weight won a prize. Contestants were weighed in, measured and ranked by aggregate loss on a weekly basis. Diet and exercise tips were provided to the audience. (Expert Report, p. 11; Saltsman Decl. ¶ 9, Ex. L; R. 56.1 Stmt. ¶ 86).

(4) **NBC's "Dateline Diet Challenge:"** This program also aired on NBC. The contestants competed to lose weight in anticipation of their 25th high school reunion. Each contestant followed one of six diet programs: i.e., Atkins, Weight Watchers, Slim-Fast, a personal diet trainer, hypnosis, and "extreme" exercise. (Expert Report, p. 11; Saltsman Decl. ¶ 10, Ex. M; R. 56.1 Stmt. ¶ 87).

(5)   **"Dr. Phil's Weight Loss Challenge:"**   Citing the "runaway" national obesity epidemic, Dr. Phil solicited participants in a competitive weight loss program that was featured periodically on his show.  Contestants lived together in a Los Angeles mansion for a five-day elimination period where they were under 24-hour camera observation and, thereafter, sent back to their own homes.  The show included stock elements, such as:  weigh-ins, tempting snacks, rewards, a personal trainer and mutual bonding with fellow competitors.  (Expert Report, p. 12; Saltsman Decl. ¶ 8, Ex. K; R. 56.1 Stmt. ¶ 89).  *Plaintiff admitted that she was aware of Dr. Phil's weight loss show before writing her Treatment and had seen "an episode or two."* (Latimore Tr. 104:2-10, 105:14-16; R. 56.1 Stmt. ¶ 89).

(6)   **"Fat Chance:"**  In this show, families competed to lose the most aggregate weight, guided by a diet nurse and fitness coach.  Each episode began and ended with an individual and aggregate weigh-in.  The winning family won a prize.  (Expert Report, p. 12; Saltsman Decl. ¶ 13, Ex. Q; R. 56.1 Stmt. ¶ 85).[5]

In addition to weight loss shows, at the time Plaintiff wrote her Treatment, there was also an established body of other reality shows that included competition, teams and/or eliminations, in combination with the motivation of interim rewards, personal bonding and conflicts, and a grand prize for the winner.  These shows include "Survivor," "Big Brother," "The Apprentice," and "Fear Factor."  (Expert Report, p. 8; R. 56.1 Stmt. ¶¶ 91-94).

In sum, a plethora  of weight loss competition and other elimination and self-improvement reality television programming preceding Plaintiff's Treatment had common elements typical of, and effectively required for, programs in this genre.  As discussed in

---

[5]      An internet search by Ginsburg revealed additional weight-loss competitions, including at least two other television shows, *Taking It Off* and *Celebrity Fit Club*, that preceded Plaintiff's "Phat Farm" treatment and included such stock structural elements of weight loss competition, as separate teams, weigh-ins, fitness trainers, personal stories and conflicts.  (Expert Report, p. 9).

Argument section C below, these stock components are not "protectible" under the Copyright Act.

**B.     Plaintiff's Treatment**

Plaintiff's work consists of a four-page "treatment" entitled "Phat Farm/Fat Farm – A Weight Loss Adventure" that she wrote in December 2003 and first provided to Fuller in February 2004.[6]  (Latimore Tr. 100:24–101:3, 60:6-61:12; 79:11-80:2; R. 56.1 Stmt. ¶¶ 35, 36, 58).   Reflecting the derivative nature of her Treatment, Plaintiff identifies its "Concept" as: "'Survivor' meets 'The Simple Life'" – a reference to two popular reality television series that preceded Plaintiff's preparation of her Treatment.   Plaintiff also admits that her Treatment incorporates multiple elements contained in "Survivor," including having separate teams, contestants who live together, hidden microphones and cameras, weekly eliminations and a prize.  (Latimore Tr. 133:21-24, 135:16-136:4, 141:4-11, 164:9-19, 166:9-14; R. 56.1 Stmt. ¶¶ 47, 50, 53, 54).

Plaintiff's Treatment contains general ideas and stock elements of a weight loss competition.[7]  For example, the Treatment describes in general terms the "Objective" as follows:

> Objective:  to develop a reality show which entertains, educates and inspires the viewing audience as well as benefits the contestants in four ways:
>
> 1.   Losing weight in a controlled environment;
> 2.   Prizes and incentives to achieve their weight loss goals.
> 3.   Development of stamina and discovering what they are made of.
> 4.   Public exposure which can enhance their lives and/or careers.

---

[6]     The Treatment is attached as Exhibit E to the Saltsman Declaration.

[7]     The few "specifics" in Plaintiff's treatment are not in *Biggest*.  "Phat Farm" describes contestants being taken to a farm, where they must pitch tents and forage for food in the fields of the farm, a lake and a chicken coop, or starve.  None of these elements appear in *Biggest*.

The "Program Design" included in the Treatment states that there will be "three (3) Phases," which Plaintiff entitled "Sacrifice," "Temptation" and "Home Stretch."

In Phase I, the contestants are initially brought to a mansion for 1-2 days of orientation where "they will be treated like royalty." During this period they will be divided into 2-3 teams and, thereafter, taken to a farm where they must fend for themselves in harsh conditions, which the Treatment describes as follows:

> Contestants will receive a 6:00 A.M. wake up call [at the mansion] and told to pack everything they'll need for a three week camping trip in less than 10-15 minutes. Contestants will be taken to the farm chosen for the show. Each team will have to pitch a tent for living quarters; assemble or build furniture for sitting and sleeping. Food will have to be harvested (picked) from the food available in the fields of the farm, i.e., fruit from an orchard of trees, lettuce, tomatoes, herbs and other vegetables. There should also be a lake (can be man made) with fish and a chicken coop (meat and eggs). Food will be cooked at first on an open campfire. No one is given food except water. If they do not forage for food or win coupons/money to buy their food they will starve.[8]

Further, during Phase I, contestants will be required to attend "a boot camp style exercise program" and will be subject to "an elimination phase as a certain amount of weight must be lost to stay in the program."

Contestants who survive Phase I advance to Phase II. The Treatment provides few specifics regarding Phase II and Phase III. In Phase II, contestants move to a "house/cabin" where the team captains "leave temptations around" in the form of fattening foods and "other

---

[8]      The contestants are described as "people who are overweight and desirous of losing a minimum of 30-100 pounds." They are divided into 2-3 teams of 4-6 people, with no indication of team make-up. The teams have as captains unspecified "celebrities or guru's in the fitness field." The teams may choose from several popular weight loss programs, such as Weight Watchers. At the farm, contestants undergo a "boot camp style" exercise program, though no particular exercises are identified. The team captains (not team members) "judge who will be eliminated from the program each week." The only basis specified in the Treatment for elimination is failing to lose" a certain amount of weight." "The team which loses the most weight every week can be given certain earns perks," such as "cots to replace sleeping bags/hay," "a hot plate," "pots and pans," or "better housing." (Saltsman Decl. ¶ 4, Ex. E ["Treatment"], p. 2).

choices the contestant would face at home or work" (e.g., television instead of exercise). During Phase II, contestants are judged individually and continue to be subject to elimination for not losing enough weight. Finally, in Phase III, the remaining contestants return to the "mansion," where they "will have access to a car, maid, chef, gym, choice of meal plan, spa, etc." (i.e., temptations of "the good life") and will compete for various prizes. The winner "will be the contestant who lost the most weight and avoided all of the pitfalls thrown in for good measure." (Treatment, pp. 2-4; R. 56.1 Stmt. ¶ 42).

The Treatment includes other general concepts. For example, the Treatment states that (i) viewers will find it "entertaining," "inspirational," and "educational" to "watch overweight people attempt to reach their weight loss goals in a competitive environment" in which they will face "[s]everal incentives and challenges," (ii) the program will encourage "overweight viewers to diet and increase their own exercise" and the audience to participate via the internet or telephone, and (iii) the winner will receive one or more of several prizes (cash, car, wardrobe, spa trip, exercise equipment, and/or diet spokesman.) The Treatment contains no details regarding, among other things, any specific contestants, incentives, challenges, exercise programs, educational ideas or manner of audience participation.

## C.   *The Biggest Loser* Television Series

### 1.   The Creation of *The Biggest Loser*

*Biggest* was created by Reveille and 25/7 Productions against the backdrop of the popularity of reality television elimination programs such as *Survivor*, *The Apprentice*, *Big Brother* and *Fear Factor*; the growing popularity of self-improvement/makeover programs; and the presence of pre-existing weight loss and fitness shows such as the six discussed above.

Specifically, in 2003, Reveille's Ben Silverman, an experienced producer of reality television programming with special expertise in international reality television formats, was

considering shows based on weight loss.  At that time, which preceded Plaintiff's preparation of
her Treatment, Reveille was well aware of pre-existing works in this genre and had already
optioned rights to *Fat Chance* (described above) and had obtained written treatments for both
*Fat Chance* and *The Big Diet* (described above).  (Silverman Decl. ¶¶ 2-3;R. 56.1 Stmt. ¶¶ 1-11).

In September 2003, 25/7 Production's David Broome was separately pursuing the idea of
a weight loss reality television series after seeing a "trainer wanted" ad in his gym.  (Broome Tr.
18:3-20; R. 56.1 Stmt. ¶¶ 12-14).  In late November/early December 2003, Broome wrote his
first treatment for the idea (Broome Tr. 18:21-19:16; R. 56.1 Stmt. ¶ 16), and, on January 8,
2004, he registered his treatment (entitled "The Biggest Loser") with the Writers Guild of
America. (Broome Tr. 20:20-21:9, 22:1-22; R. 56.1 Stmt. ¶ 17).

Silverman and Broome knew each other and, when they learned that they each were
interested in developing a weight loss reality television program, decided to pitch their ideas
jointly to Jeff Gaspin, who was then the Executive Vice President of Alternative Series,
Longform, Specials and Program Strategy at NBC.  (Broome Tr. 27:10-22, 29:13-30:4;
Silverman Tr. 69:5-10; R. 56.1 Stmt. ¶ 21).  In mid-January 2004, Silverman and Broome,
together with Broome's agent, John Ferriter, and another Reveille employee, Mark Koops,
pitched Gaspin both *Fat Chance* and *The Big Diet* while attending the annual NATPE conference
in Las Vegas.[9]  (Broome Tr. 30:15-31:5, 34:9-21, 36:5-19; Silverman Tr. 66:17-67:5, 72:25-
73:22; R. 56.1 Stmt. ¶ 23).  Gaspin liked elements of both proposed shows, but felt that they
should be reconfigured as a two team competition and aired during prime time. (Broome Tr.
38:20-39:8; Silverman Tr. 74:17-75:5; R. 56.1 Stmt. ¶ 24).

---

[9]     NATPE is the National Association of Television Program Executives which holds an
annual conference at which television ideas are often pitched to networks.

On February 23, 2004, Broome and Koops met in Silverman's office at Reveille to work on the format for the reconfigured show. At the conclusion of this session, Broome created a one page outline of the format elements for *Biggest*. (Broome Decl. ¶ 3; R. 56.1 Stmt. ¶ 26). This creative process continued over the ensuing week until, on March 4, 2004, Koops sent NBC executives Craig Plestis and Jayson Dinsmore a series "bible" for *Biggest*. (Broome Decl. ¶ 3; R. 56.1 Stmt. ¶ 27). This "bible" incorporated the collaboration between Silverman, Koops and Broome, with no input from anyone else. (Broome Decl. ¶ 3; R. 56.1 Stmt. ¶ 28).

On or about March 18, Reveille received verbal notice that NBC was formally ordering *Biggest* into production. (Broome Decl. ¶ 3; R. 56.1 Stmt. ¶ 29). Shortly thereafter, 3 Ball Productions was hired to be the "show runner", i.e., to handle the day to day production and filming of the series. (Roth Decl. ¶ 2; R. 56.1 Stmt. ¶ 31). NBC announced the show in a press release issued in May 2004. (Silverman Tr. 122:23-25; R. 56.1 Stmt. ¶ 32). *Biggest* debuted in October 2004 and is now in its tenth season. (Roth Decl. ¶ 2; R. 56.1 Stmt. ¶ 33).[10]

### 2.   Summary Description of *The Biggest Loser* Series

In the first season of *Biggest*, 12 overweight contestants lived together in a ranch resort for a projected 12 weeks.[11] (Expert Report, pp. 3-4; R. 56.1 Stmt. ¶ 34). The show was presented by a female host, Caroline Rhea. The dieters were divided into two teams. Each team was assigned its own fitness trainer who acted as both a dietician and an exercise coach. Each trainer had a different approach to diet, exercise, and psychological support, e.g., one advocated

---

[10]    Further details and documentation regarding the creation and development of *Biggest* are set forth in the R. 56.1 Statement and supporting evidence. (R. 56.1 Stmt. ¶¶ 1-31).

[11]    While each season has new contestants and twists, the gist of the series has not changed since the first season. (Expert Report, p. 3). In support of their motion for summary judgment, the NBC Defendants have provided the Court with DVDs of the entire first season plus the first and last episodes of seasons 2 through 4. (Saltsman Decl. ¶ 5, Ex. F). Additional episodes can be provided if requested.

an "eat more" (to feel full) regimen; the other advocated an "eat less" approach).  Temptations to "cheat" were introduced (including glass-front refrigerators stocked with each competitor's favorite pre-competition foods).

The dramatic core of the series was driven by the combination of competition (not only with respect to individual and aggregate weight loss itself, but also with respect to team "challenges" that resulted in tactical advantages or penalties between the teams) and regular weekly participant elimination (based upon a vote by the team which cumulatively lost the lesser amount of weight during the applicable week).  The team that lost the greater amount of weight each week typically received a small reward.  The final reward was a $250,000 cash prize to the one contestant who ultimately lost the highest combined percentage of his or her body weight and body fat.  As on other shows of this genre, the close contact under competitive pressure, but with naturally-conflicting tendencies both to support one's teammates but also to improve one's own individual chances of eventual success, led to displays of emotional highs and lows.  (Expert Report, pp. 3-4; R. 56.1 Stmt. ¶ 34).

The series started with a "baseline" weigh-in, body size measurement and body fat calculation via a water displacement mechanism, all portrayed on an elaborate set with an elevated, oversize scale and numerical weight read-outs.  At the end of each week, the contestants were re-weighed in the same on-screen ceremony.  The team which lost less was obliged to "vote off" one member presumably thought to be the one least likely to be helpful to the team's success in the remaining weeks.  As in other pre-existing reality shows such as *The Apprentice, Survivor* and *American Idol,* the end-of-episode assessment, vote result, and contestant elimination was depicted as a formulaic ritual (including turning off the name-light on

the departing contestant's "temptation" refrigerator).[12]   (Expert Report, pp. 3-4; R. 56.1 Stmt. ¶ 34).

Each season and each episode of *Biggest* includes specific events, unique contestants, unscripted dialogue, original challenges with detailed rules and unscripted emotional reactions to events that unfold during the series.   These are conveyed to the audience by filmmaking techniques and editing choices which result in concretely expressive and unique stories.

**D.      The Creators of *Biggest* Did Not Have Access to Plaintiff's Treatment**

Plaintiff did not pitch or submit her Treatment to either of the NBC Defendants. (Latimore Tr. 34:12-18; 54:17-55:6; R. 56.1 Stmt. ¶ 66).   The only defendant to whom Plaintiff provided a copy of her Treatment was Fuller.   (Latimore Tr. 60:6-61:12, 79:19-80:5; R. 56.1 Stmt. ¶ 58).   However, Fuller testified at this deposition that, among other things, he had never had any business dealings or relationship with the NBC Defendants, never communicated with the NBC Defendants, and never gave a copy of Plaintiff's Treatment to the NBC Defendants or to anyone else.   (Fuller Tr. 24:10-25:2, 46:15-21, 46:25-48:9, 114:19-23; R. 56.1 Stmt. ¶ 60, 61, 64).

Plaintiff has no admissible evidence to refute Fuller's testimony.   While Plaintiff alleges that Fuller "gave [her] treatment to NBC or Reveille," she has no personal knowledge of that occurring; she only speculates "on information and belief."   (Latimore Tr. 96:6-97:17; R. 56.1 Stmt. ¶ 75).   Plaintiff admitted during her deposition that the basis for her belief that Fuller had

---

[12]      In Season One, the last three finalists returned to their everyday lives for 12 more weeks of self-managed diet and exercise, applying the principles they learned and succeeded with on the ranch.   Only after that next phase was done were they reassembled for a live-television final weigh-in.   (Expert Report, p. 4).   Nothing like this is described in "Phat Farm."   (Latimore Tr. 192:16-193:5; R. 56.1 Stmt. ¶ 57).

communicated with NBC about her Treatment was a conversation she had with a woman named Livia Milano *after Plaintiff filed her lawsuit*. (Latimore Tr. 35:9-37:16; R. 56.1 Stmt. ¶ 76).

Ms. Milano, like Plaintiff here, sued the NBC Defendants, alleging that *Biggest* infringed on Ms. Milano's copyrighted treatment for a weight loss competition show. (R. 56.1 Stmt. ¶ 76). In 2008, Ms. Milano's claims were dismissed on defendants' motion for summary judgment. Milano, supra, 584 F. Supp. 2d at 1297. Plaintiff testified that Ms. Milano "alluded" to Fuller having had communications with NBC. (Latimore Tr. 36:6-23; R. 56.1 Stmt. ¶ 76). When asked to describe the "allusion," Plaintiff testified that Ms. Milano told her that Fuller's name "came up during one of the depositions with NBC" in Milano's lawsuit, but that she did not recall the specifics of what was said about him. (Latimore Tr. 35:9-37:16, 193:10– 194:11; R. 56.1 Stmt. ¶ 76). Plaintiff also admitted that she never received a copy of the transcript in which Mr. Fuller's name allegedly "came up." (Latimore Tr. 37:12-16; R. 56.1 Stmt. ¶ 76). In fact, Fuller's name does not appear in the transcript of any of the depositions taken in Ms. Milano's lawsuit. (Friedman Aff. ¶ 5, Ex. D at 2; Saltsman Decl. ¶ 3).

Plaintiff also purports to rely on a conversation that she claims to have had with Miatta Haj Smith to support her allegation that Fuller and/or Ms. Smith communicated with NBC about her Treatment.[13] (Latimore Tr. 41:24-42:21; R. 56.1 Stmt. ¶ 79). Once again, however, Plaintiff's assertion is without admissible evidentiary support. Plaintiff testified that she based her belief on a conversation that she had with Ms. Smith in which Ms. Smith: (i) asked Plaintiff to come to a meeting (ii) did not tell Plaintiff what the meeting was about (iii) did not state who Plaintiff would be meeting with, and (iv) did not say anything referencing Plaintiff's Treatment or NBC Universal. The meeting with Ms. Smith referred to in the alleged conversation did not

---

[13]    Plaintiff described Ms. Smith as a "friend" that she has known since they met in law school in 1980. (Latimore Tr. 55:16-25).

take place.  (Latimore Tr. 34:19-35:3, 42:11-21, 43:12-45:22, 89:9-90:20, 91:7-15; R. 56.1 Stmt. ¶¶ 79-80).

Tellingly, when Plaintiff was asked why she believed that her conversation with Ms. Smith had "anything to do with Mr. Fuller having any communications with NBC Universal about [her] Treatment," she testified: *You just know*."  (Latimore Tr. 44:21-45:22 (emphasis added)).

As discussed in Argument section B below, this conversation does not establish a genuine question of material fact as to whether the NBC Defendants had access to her Treatment.  In fact, following Plaintiff's deposition, Ms. Smith signed a Declaration in which she stated that she had never had any communications concerning Ms. Latimore's Treatment with the NBC Defendants.[14]  (Smith Decl. ¶ 5; R. 56.1 Stmt. ¶ 83).

## ARGUMENT

The sole claim asserted against NBC and Reveille is the first claim of the Amended Complaint, which is for copyright infringement.[15]  Plaintiff alleges that defendants "copied and usurped substantial and integral elements of plaintiff's treatment" and "distributed those elements as a television reality show."  (Am. Compl. ¶ 20).  Plaintiff alleges a list of commonplace ideas and staples of the reality television genre that she claims defendants copied from her Treatment, including: "catch phrases," "the number of teams," that "contestants would

---

[14]    Plaintiff also testified during her deposition that "possibly" Ms. Smith's husband, Walter Smith, communicated with the NBC Defendants about her Treatment. (Latimore Tr. 34:19-35:3; R. 56.1 Stmt. ¶ 82).  However, Plaintiff admitted that she had no personal knowledge of Mr. Smith having any such communications and that her only basis for so testifying was because he was Ms. Smith's husband. (Latimore Tr. 89:23-90:10; R 56.1 Stmt. ¶ 82).

[15]    The second and third claims for conversion and unjust enrichment were dismissed by this Court on August 5, 2009.  See Order Granting in Part, and Denying in Part, Defs.' Mot. to Dismiss, Aug. 4, 2009.  The fourth claim for relief for breach of contract is expressly alleged against defendant McCreary & Fuller only. (Am. Compl. ¶¶ 34-39).

live together," "hidden microphones and cameras," "food temptations," "celebrity trainers," "different dieting methods," eliminations, "a large money prize," a "prime time" slot, and other familiar and generic concepts for a weight loss reality television competition. (Am. Compl. ¶ 15).

## A.      Applicable Procedural Law

The standard for summary judgment is well established.  A court should grant a motion for summary judgment if "there is no genuine issue as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).[16]

To prevail on a copyright infringement claim, a plaintiff must prove: "'(1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original.'" Abend Revocable Trust v. Spielberg, No. 08-cv-7810, 2010 WL 3701343, at *2 (S.D.N.Y. Sept. 21, 2010) (citing Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340 (1991)).[17] "The second criterion, copying of original constituent elements, may be proven with either direct or indirect evidence: to prove copying via indirect evidence, a plaintiff must show (1) defendant's access to the allegedly infringed work; (2) actual copying;[18] and (3) unlawful appropriation of

---

[16]     Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In applying this standard, a court should look to the substantive law to determine which facts are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  To raise a genuine issue, the non-moving party must have more than "a scintilla of evidence" in support its position. Id. at 252.  Moreover, "[t]he non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998); Jorgensen, supra, 351 F.3d at 51 (affirming summary judgment dismissal of copyright claim).  If the evidence is "merely colorable" or "not significantly probative," summary judgment should be granted. Anderson, 477 U.S. at 249-50.

[17]     For purposes of this motion, the NBC Defendants assume Plaintiff's ownership of a valid copyright registration for her Treatment.

[18]     Actual copying requires a finding of "probative similarity."  Probative similarity exists if the similarities, in the normal course of events, would not be expected to arise independently.

copyrightable materials." Id. (citations omitted).  Moreover, even assuming, *arguendo*, that Plaintiff could raise genuine issues of material fact with respect to the access and unlawful appropriation of copyrightable materials—which she cannot, as discussed in sections B and C, below – summary judgment would still be appropriate based upon the incontrovertible evidence that the NBC Defendants independently created *Biggest* (see, infra, Argument, § D).

**B.    Plaintiff Has Not Raised A Genuine Issue of "Access" To Her Treatment By Anyone Involved in the Creation of *The Biggest Loser***

Plaintiff bears the burden of proving by admissible evidence that the NBC Defendants had access to her copyrighted work. See Jorgensen, supra, 351 F.3d at 51 ("In order to support a claim of access plaintiff must offer 'significant, affirmative and probative evidence.'") (citations omitted). "Access means that an alleged infringer had a 'reasonable opportunity'—not simply a 'bare possibility'" to view or copy the plaintiff's work. Id.; Tisi, supra, 97 F. Supp. 2d at 547. Access "cannot be based on mere 'speculation or conjecture.'" Jorgensen, 351 F.3d at 51 (quoting Gaste v. Kaiserman, 863 F.2d 1061, 1066 (2d Cir. 1988)).

Unless the work has been widely disseminated, to establish access, a plaintiff must show the existence of a specific chain of events through which the alleged infringer gained access to the allegedly infringed work. Mowry v. Viacom Int'l, Inc., No. 03-civ-3090, 2005 WL 1793733, at *5-7 (S.D.N.Y. July 29, 2005) (citations omitted). It is insufficient to show that just anyone received a copy of the work; plaintiff must show, at a bare minimum, that the recipients were sufficiently connected to the alleged infringers. Id. at *6-7.

---

Tienshan, Inc. v. C.C.A. Int'l, 895 F. Supp. 651, 656-657 (S.D.N.Y. 1995) (probative similarity exists between two dinnerware box designs with nearly identical placements of photographs, written descriptions, and highlighting and placement of text). Here, Plaintiff cannot establish probative similarity because the alleged similarities between "Phat Farm" and *Biggest* are common to all weight loss reality shows. See, infra, Argument, § C.

In Mowry, the plaintiff circulated a few dozen copies of his screenplay "to various individuals in the entertainment and advertising industry." Id. at *4. Through this distribution, the plaintiff alleged that the defendants obtained a copy of his screenplay and used it in creating their movie. Id. There was no evidence that the recipients of plaintiff's screenplay worked for or had any connection with the defendants. Id. at *6. Because the plaintiff failed to establish any connection between the recipient and the creators of the allegedly infringing work, the access claim was insufficient as a matter of law. Id. at *7. Accordingly, the court granted defendants' motion for summary judgment and dismissed the copyright infringement claim.

Similarly, in Tisi, a plaintiff-songwriter sued a rock band and the band's record label for copyright infringement of his unpublished musical composition. Tisi, 97 F. Supp. 2d at 541. Plaintiff attempted to prove access by showing that his father had sent unsolicited tapes of his song to a number of major record companies, including the label that distributed the defendant rock band's song. Id. at 541-543. However, the plaintiff failed to raise a triable issue of fact as to access because there was no evidence that his tape was conveyed from one of the recipient record companies to the allegedly infringing rock band.[19] Id. at 547.

As in Mowry and Tisi, Plaintiff here has not established a connection between the recipient of the allegedly infringed work, i.e., Fuller, and the creators of the allegedly infringing work. Plaintiff's only "proof" of access is her speculation that Fuller gave her Treatment to the NBC Defendants. However, Plaintiff's speculation is expressly controverted by the evidence and is insufficient as a matter of law. Plaintiff's access claim rests on her conjecture that two

---

[19]     Even if a corporate defendant acknowledges receipt of the allegedly infringed work, an allegation of "bare corporate receipt" is insufficient to raise a triable issue of access. Bunick v. UPN, No. 06-cv-2833, 2008 WL 1968305, at *4 (S.D.N.Y. Apr. 30, 2008) (speculation about what occurred after allegedly infringed work sent to corporation fails to establish access as a matter of law).

people—Kim Fuller and Miatta Smith (and "possibly" Walter Smith)—had communications with the NBC Defendants regarding Plaintiff's Treatment. However, Plaintiff admittedly has no personal knowledge of any of these persons ever having communicated with the NBC Defendants about the Treatment and has no admissible evidence to support her speculation that such communication occurred. (R. 56.1 Stmt. ¶ 74-75, 81-82).

Plaintiff admits that the only defendant to whom she gave the Treatment is Fuller, a person who has no relationship with either of the NBC Defendants. Fuller testified, without contradiction, that he has never entered into any television deals with the NBC Defendants and that he never sent Plaintiff's treatment to <u>anyone</u>, much less NBC Defendants. (R. 56.1 Stmt. ¶¶ 60, 61, 64).

Nor was the Treatment sent or communicated to the NBC Defendants by Miatta Smith or her husband, Walter Smith. Although Plaintiff speculated that Ms. Smith must have attended a meeting with NBC Defendants regarding her Treatment, this speculation is unsupported by admissible evidence. (R. 56.1 Stmt. ¶¶ 78-82). First, nothing in Plaintiff's description of her conversation with Ms. Smith supports her conjecture that the purported conversation related to her Treatment, much less to whether or not the NBC Defendants had access to the Treatment. (R. 56.1 Stmt. ¶¶ 79-80). Second, Plaintiff's claim is expressly refuted by Ms. Smith's sworn declaration that, aside from Plaintiff and Fuller, she did not communicate with anyone about Plaintiff's Treatment. (Smith Decl. ¶ 5; R. 56.1 Stmt. ¶ 83). Finally, Plaintiff admits that she has no personal knowledge of Ms. Smith or her husband, Walter Smith, having any communications with the NBC Defendants or attending any meetings with them.[20] (R. 56.1 Stmt. ¶ 82).

---

[20]    Plaintiff's ability to establish a genuine issue of material fact of access is further undermined by the uncontroverted testimony of Silverman and Broome, each of whom has

In short, summary judgment should be granted because Plaintiff has failed to raise a triable issue of access.[21]

## C.    Plaintiff Cannot Show that *The Biggest Loser* Television Series is "Substantially Similar" to Her Treatment

To prevail on a claim for copyright infringement, a plaintiff must show that her work and the allegedly infringing work are "substantially similar in protected expression." Williams v. Crichton, 84 F.3d 581, 587 (2d Cir. 1996).  Even assuming, for the sake of argument, that Plaintiff could produce sufficient evidence of access to avoid summary judgment—which she cannot—summary judgment is still warranted because Plaintiff cannot raise a genuine issue of material fact that "substantial similarities exist as to protectible material in the two works," such that there was unlawful copying of Plaintiff's work.  Walker, supra, 784 F.2d at 48 (citing Reyher v. Children's Television Workshop, 533 F.2d 87, 90 (2d Cir. 1976)).  A comparison of the Treatment and of *Biggest* reveals that the alleged similarities are merely general ideas, *scenes a faire* and/or unoriginal concepts from prior television programs that are not protected by copyright law.

---

provided detailed, corroborated and specific evidence of independent creation.  See, infra, Argument, § D.

[21]    Where, as here, Plaintiff is unable to offer sufficient evidence to raise a triable issue of fact of access, the only way for her to overcome this deficiency and avoid the summary dismissal of her claim is by showing that the two works are "strikingly similar."  This onerous standard can only be met if the works are "so nearly alike that the only reasonable explanation for such a great degree of similarity is that the later . . . was copied from the first."  Mowry, supra, 2005 WL 1793773, at *11 (no striking similarity between unpublished manuscript and fully-realized film with common idea of television program based on secret recording of person's life).  As in Mowry, Plaintiff here cannot show that her bare-bones Treatment is substantially similar, much less strikingly similar, to *Biggest*, a fully realized television show, simply because they both involve the idea of a weight loss competition reality television show.  Indeed, the two works are not even "substantially similar."  See, infra, Argument, § C.

1. **Summary Judgment Is Required Where Two Works Are Not "Substantially Similar" Under The Second Circuit's "More Discerning Ordinary Observer" Test**

Copyright law does not protect elements that are not original to the author.  17 U.S.C. § 102(a); Boisson v. Banian, Ltd., 273 F.3d 262, 268 (2d Cir. 2001) (unoriginal material cannot "be appropriated by a single author even though it is included in the copyright work").  Thus, to prove unlawful appropriation, "a plaintiff must show that there is substantial similarity between protectible elements in the two disputed works."  Abend Revocable Trust, supra, 2010 WL 3701343, at 2 (emphasis added).  Where a "work is an amalgamation of protectible and unprotectible elements, a more 'discerning' ordinary observer test is employed."  Id.; see also Rodriguez, 2008 WL 4449416, at *4.  As set forth in Abend Revocable Trust v. Spielberg, this test:

> requires that the court first filter out from consideration any non-protectible elements.  The remaining, protectible elements are then analyzed for substantial similarity. . . . Thus, similarities between unprotectible elements in the disputed works may not contribute to a determination of substantial similarity.

Abend Revocable Trust, supra, 2010 WL 3701343, at *2.  To determine whether the works are substantially similar, the court should examine protectible elements included in the "total concept and feel, theme, characters, plot, sequence, place and setting" of the works.  Id. at *3 (quoting Williams, supra, 84 F.3d at 588).

Courts viewing plot ideas far more developed than those included in Plaintiff's Treatment have refused to provide protection for those ideas.  See, e.g., Reyher, supra, 533 F.2d at 92 (summary judgment granted; no protection for plot idea that to a "lost child" the "familiar face of the mother is the most beautiful face, even though the mother is not, in fact, beautiful to most"); Walker, supra, 784 F.2d at 46-47 (summary judgment granted; plot idea of newly arrived police officer "shocked by [police station's] squalor," responding to "the crime and decay of the South

Bronx," while dealing with problems of officer morale was not protectible); <u>Abend Revocable Trust</u>, <u>supra</u>, 2010 WL 3701343, at *5 (summary judgment granted; plot line involving "male protagonist, confined to his home, who spies on neighbors to stave off boredom and, in doing so, discovers that one of his neighbors is a murderer" not protectible); <u>Willis v. Home Box Office</u>, No. 00-cv-2500, 2001 WL 1352916 (S.D.N.Y. Nov. 2, 2001) (summary judgment granted; plotline of "smarmy" agents who are "utterly amoral in their approach to their businesses" not protectible).

A number of district courts, including in this District, have similarly dismissed copyright actions involving unscripted "reality" television programs prior to trial, ruling that the alleged similarities were not protectible.  <u>See, e.g.</u>, <u>Rodriguez</u>, <u>supra</u>, 2008 WL 444916 (*Project Runway*); <u>Milano</u>, <u>supra</u>, 584 F. Supp. 2d 1288 (*The Biggest Loser*); <u>Zella</u>, 529 F. Supp. 2d 1124 (*Rachel Ray*); <u>Bethea</u>, <u>supra</u>, 2005 WL 1720631 (*The Apprentice*).

The <u>Milano</u> decision, which addressed the exact same reality show at issue here, highlights the futility of Plaintiff's copyright claim and the commonplace nature of the elements that she included in her project.  The plaintiff in <u>Milano</u> alleged that *Biggest* infringed on her weight loss competition treatment.  Milano's treatment (entitled "From Fat to Phat"), like Plaintiff's Treatment (entitled "Phat Farm/Fat Farm – A Weight Loss Adventure"), included contestants seeking to lose 40 to 100 pounds living together for 13 weeks, a team element, expert trainers, weekly rewards, guest celebrities, use of established diet programs such as Weight Watchers, weekly weigh-ins and weekly eliminations. <u>See</u> <u>Milano</u>, <u>supra</u>, 584 F. Supp. 2d at 1291-1292.  In granting defendants' summary judgment motion and dismissing Milano's lawsuit, the court in <u>Milano</u> held that the "themes of competition, weight loss, diets, fitness programs, and the like . . . are really ideas that are not protectible." <u>Id.</u> at 1297; <u>see also</u> <u>Bethea</u>, <u>supra</u>,

2001 WL 1720631, at *11 ("depict[ing] a group of dynamic contestants from varied backgrounds competing in business challenges in a dynamic corporate environment for promotions and benefits" not protectible); Zella, supra, 529 F. Supp. 2d at 1134 (cooking show with non-protectible "stock elements of a host, guest celebrities, an interview, and a cooking segment").

Rodriguez reached the same conclusion as Milano, but in the fashion design competition show context. Rodriguez held that elements related to fashion design shows, e.g., "use of a panel of judges composed of fashion industry experts, a design workroom with sewing machines, a specific number of contestants, professional models, hairstylists, make-up artists, weekly episodes and the setting of New York," were *scenes a faire* that "all necessarily flow from the uncopyrightable idea of a fashion design reality show." Rodriguez, supra, 2008 WL 4449416, at *5. Accordingly, the court ruled that such generic similarities were not protectible. Id.

## 2. Plaintiff Has Failed to Identify *Any* Protectible Similarities Between Her Treatment and *The Biggest Loser*

To support her claim that *Biggest* infringes on her Treatment, Plaintiff's Amended Complaint includes a laundry list of alleged similarities that are merely general plot ideas, *scenes a faire*, and/or unoriginal concepts that are not protected by copyright law. (Am. Compl. ¶ 15). Not only is Plaintiff's "list method" of comparing the works "inherently subjective and unreliable," (Walker, supra, 615 F. Supp. at 435 (quoting Litchfield v. Spielberg, 736 F.2d 1352, 1356 (9th Cir. 1984)), but also, the similarities described in her list are, in the words of the Court in Bethea, "staples of the genre." Bethea, supra, 2005 WL 1720631, at *15.

By way of example only, Plaintiff alleges that *Biggest* copies "substantial and integral material" from her Treatment, such as: (1) number of teams/and or contestants: (2) contestants living together; (3) hidden microphones and cameras to watch the contestants every move; (4) eliminations; and, (5) use of well-known diet programs. (Am. Compl. ¶ 15). Far from

24

constituting original, protectible elements, Plaintiff's own testimony admits that they are derivative, *scenes a faire* that are to be expected in a weight loss reality television show.  For example, during her deposition, Plaintiff admitted that she:

- did not invent the concept of a reality television show where contestants were grouped in teams and or lived together and shows like *Big Brother* and *The Real World*, which pre-date her Treatment, incorporated those concepts.  (Latimore Tr. 133:21-24, 135:16-136:4; R. 56.1 Stmt. ¶ 47).

- did not invent the concept of a reality show that uses microphones and cameras to monitor the contestants on a continuous basis and that *Survivor* (a show she identified in her Treatment) incorporated those concepts (Latimore Tr. 141:4-8; R. 56.1 Stmt. ¶ 50).

- did not invent the idea of having weekly eliminations and, again, that *Survivor*, among others, used this concept before she wrote her Treatment.  (Latimore Tr. 164:9-13, 15-19, 166:9-14; R. 56.1 Stmt. ¶¶ 53-54).

- is not the only person who could exploit a weight loss show that refers to well-known diet programs.  (Latimore Tr. 183:8-11, 14; R. 56.1 Stmt. ¶ 56).

Consistent with the foregoing, Plaintiff's "Concept" for her series, i.e., "'Survivor' meets 'The Simple Life'," reflects that the Treatment incorporates elements of pre-existing reality programs that are not original to Plaintiff.   Notably, Plaintiff acknowledged during her deposition that she did not seek permission from anyone associated with "Survivor" in connection with her incorporating into her Treatment the very same elements from "Survivor" that she claims constitutes infringement here.  See Latimore Tr. 116:17-117:6 (did not request permission to use teams; *"Why would I? . . . team competition is ancient"*), 118:9-13 (did not request permission to have contestants live together; *"Why would I?  That's a general – that's a general concept"*), 118:14-119:7 (did not request permission to use hidden cameras and microphones; *"Why would I? . . . If you're developing a show, you have to have cameras and microphones"*), 120:10-121:6 (did not request permission to include eliminations; *"Why would I? . . . My elimination is not like their elimination"*).

In addition to Plaintiff's admission that generic similarities are not original or unique to her Treatment, and not something for which she believed permission was needed to include in her Treatment, the similarities she complains about are indisputably present in virtually all of the prior weight loss and/or reality television shows described in Section A of the Factual Background. See, supra, pp. 5-7.  In fact, the Milano decision identifies the following elements—many of which are also present in Plaintiff's Treatment – as non-protectible in the context of a weight loss show: (i) teams, (ii) a winner, (iii) prizes (both for the overall winner and in specific contests, (iv) exercise and fitness activities, (v) focus on the struggles of grossly overweight an out of shape contestants, (vi) fitness tips, (vii) discussion of diet, healthy eating and diet tips (including reference to well known dietary programs), (viii) exercise and dietary experts, (ix) weigh-ins, and (x) group challenges requiring contestants to work as a team.  Milano, supra, 584 F. Supp. 2d at 1295-1296.

Once the protected elements are filtered out from Plaintiff's bare-bones outline of ideas, there is no material left with which to make a comparison under the Second Circuit's "more discerning ordinary observer" test.  Nevertheless, the following discussion compares the two works, to the extent possible, in terms of their "total concept and feel, theme, characters, plot, sequence, place and setting."  Rodriguez, supra, 2008 WL 4449416, at *4.

**Total concept and feel:**  Aside from the generic similarity of a weight loss reality television series, the overall "look and feel" of Plaintiff's Treatment is very different from *Biggest*.  The core dramatic element in *Biggest* is that each week the losing team must vote off one of its own members, which requires contestants to jockey, strategize and "balance the need to keep strong team members to succeed in competition against their opponents against the prospect that a strong team member might prove to be a formidable obstacle to winning the

grand prize." Milano, supra, 584 F. Supp. 2d at 1293. Conversely, the core dramatic element of the Treatment appears to be, at least at the outset, requiring the contestants to construct shelters, pitch tents and forage for food on an actual farm or starve. *Biggest* has no such elements. Further, while the Treatment has an "elimination" component, this stock reality television element is expressed differently because the elimination is performed by the team captains, i.e. celebrities or fitness gurus, based on the amount of weight lost and is "distinguishable" on that basis. Rodriguez, supra, 2008 WL 4449416, at *5; CBS Broad., Inc. v. ABC, Inc., No. 02-CV-08813-LAP, 2003 WL 23407514,at *1 (S.D.N.Y. Jan. 14, 2003) (denying motion by producer of *Survivor* to preliminarily enjoin ABC's *I'm a Celebrity – Get Me Out of Here* reality television show after finding no likelihood of success on merits of copyright infringement claim; ruling, among other things, that eliminations in two shows were not substantially similar when in one they were by team vote and in other they were not).

**Theme:** Plaintiff's theme of a "Weight Loss Adventure," roughing it on the farm and advancing to live in a mansion, are all absent from *Biggest*. The only similar themes of competition, weight loss, diets, and fitness programs, are "ideas that are not protectible." Milano, supra, 584 F. Supp. 2d at 1297; Am. Direct Mktg., Inc. v. Azad Int'l, Inc., 783 F. Supp. 84, 95 (E.D.N.Y. 1992) ("Material or themes commonly repeated in a certain genre are not protectible by copyright").

**Characters:** Plaintiff's treatment describes no specific characters or contestants, only "people who are overweight" and "celebrities or gurus in the fitness field." In contrast, the contestants in *Biggest* are real people whose characters are developed over the course of the series. Milano, supra, 584 F. Supp. 2d at 1297 ("character is developed entirely throughout the dynamic interaction of the contestants over the course of the program"). Further, the trainers in

*Biggest* did not start out as "celebrities" or as "fitness gurus," but became "famous" after and as a result of their appearances on the show.  Lastly, *Biggest* also adds a host, a character not found in Plaintiff's Treatment, who "plays an important role . . . by periodically revealing new twists to the competition." Id.

**Plot/Sequence:**  The Treatment's "plot" is merely an outline of a contest structure, which "is not original and therefore not protectible." Id. at 1296.  The only portion of the Treatment with any semblance of a plot is the description of the contestants being taken to the farm for survival challenges, which is not an element found in *Biggest*.

**Place/Setting:**  The Treatment's setting is an unidentified remote farm with crops, orchards, chicken coops and the like, which provide the contestants with a means of foraging for food to survive.  Other settings in the Treatment include a generic "house/cabin" and "mansion." In contrast, *Biggest* has only a single setting, which is an "elegant" ranch compound with "fitness equipment and comfortable accommodations." Id. at 1297.

In summary, Plaintiff's Treatment and *Biggest* contain few similarities, and those that do exist are insubstantial and not protected by copyright law.  To the extent that Plaintiff's Treatment contains any expressive details, they are dissimilar to those in Biggest.  Accordingly, there is no genuine issue of fact as to the similarity requirement.  Treatment contains any expressive details, they are dissimilar to those in *Biggest*.[22]  Accordingly, there is no genuine issue of fact as to the similarity requirement.

---

[22]     The only element in Plaintiff's treatment that is arguably not generic to all weight loss competition shows is the paragraph describing the contestants being taken to a farm, where they must pitch tents and forage for food in the fields of a farm, a lake, and a chicken coop or starve. (Treatment, p. 3, ¶ j).  Plaintiff has not and cannot allege that this is similar to *Biggest*.  Summary judgment is warranted where the only portion of Plaintiff's treatment that is at all specific is not similar to *Biggest*.  See, e.g., Walker, supra, 784 F.2d at 50-51 (summary judgment granted; scene in works in issue in which person is thrown off roof were "overwhelming[ly]" different as

**D.** **The NBC Defendants Have Produced Uncontroverted Evidence That *The Biggest Loser* Was Independently Created, Without Reference to Plaintiff's Treatment**

Even if Plaintiff were able to raise a genuine issue as to access and substantial similarity, the NBC Defendants would still be entitled to summary judgment because they have provided unrefuted evidence that *Biggest* was independently created without reference to Plaintiff's Treatment.  Tisi, supra, 97 F. Supp. 2d at 549 (granting summary judgment dismissal of copyright claims; "[e]ven a *prima facie* case of copying may be rebutted by proof of independent creation").  In particular, sworn testimony "detailing the genesis of [defendant's] idea" may be "powerful evidence" of independent creation.  Bunick, supra, 2008 WL 1968305, at *7.

The NBC Defendants have provided detailed and specific evidence of independent creation, both testimony and supporting documentation.  (R. 56.1 Stmt. ¶¶ 1-29).  The creation and development of *Biggest* is set forth in the sworn testimony of the NBC Defendants, which establishes that they independently created the idea and independently developed *Biggest*, with no reference to Plaintiff or her Treatment.  (See Silverman Decl. and Broome Decl).  Plaintiff has no evidence to rebut NBC Defendants' showing of independent creation.

---

to how incident occurred); Rodriguez, supra, 2008 WL 444916, at *6 (summary judgment granted; concept and feel of fashion show that gives viewers "a glimpse into the world of high fashion" is "plainly distinguishable" from fashion show that "caters to engaging the fashion sensibilities of its 'real American' audience"); Willis, supra, 2001 WL 1352916, at *2 (summary judgment granted; character who wears "casual clothes" and is "former All-American and professional football player" is not substantially similar to character who "dresses in Armani suits" and is "a failed athlete").

## CONCLUSION

For the reasons set forth above, the Court should grant summary judgment for the NBC Defendants on Plaintiff's claim for copyright infringement.

Dated:  November 8, 2010
New York, New York

Respectfully Submitted,

**KATTEN MUCHIN ROSENMAN LLP**

By: _____
Alan R. Friedman (AF 1513)
575 Madison Avenue
New York, New York 10022
Telephone:  (212) 940-8800
Facsimile:  (212) 840-8776

*Attorneys for Defendant NBC Universal, Inc., and Reveille, LLC*